* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the contraction of the occupational disease, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Toastmaster, Inc. was a self-insured employer with Corporate Claims Management as servicing agent.
In addition, the parties stipulated into evidence the following:
1. Industrial Commission forms 18, 21, 33, and 33R contained in this file and in I.C. 868987, the duplicate file which was consolidated with the current file.
2. A folder of indexed documents (containing discovery, ESC records, personnel records, and medical records).
3. The depositions of Joseph Appollo, PhD, Mark E. Brenner, M.D., Stephen D. Carpenter, M.Ed., CRC, CDMS, CCM, MES, Charles Earl (Chuck) Jackson, PT, and Jane Mantovani, OTR/L are a part of the evidentiary record in this case.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was thirty-nine years old. Plaintiff participated in special education classes and completed the ninth grade. Plaintiff's work history prior to her employment with defendant includes cleaning hotel rooms for approximately three years, inspecting curtains for one year, and working at a chicken processing plant.
2. Plaintiff began working for defendant as an assembler in October 1996. Plaintiff's initial job for the first six months of her employment with defendant was a UPC labeling position which involved pulling UPC stickers or labels off a roll and placing them on boxes coming down a conveyor belt. Despite the quick pace, plaintiff had no problems with adequately performing this job. Plaintiff was then transferred to "dialing," a more mentally and physically challenging position which involved inserting the movement into the back of a clock, turning the clock over, and then putting the hour and minute hands on the front of the clock. Plaintiff's required production rate in the dialing position was one hundred twenty-five clocks per hour.
3. Plaintiff began experiencing problems with pain and numbness in her right hand in 1997. Plaintiff's symptoms worsened in January 1998 at which time she reported them to defendant's plant nurse who referred her to Occupational Health at Scotland Memorial Hospital. Plaintiff received conservative treatment and was temporarily restricted to light-duty work, but was released to return to regular duty in her dialing position by the authorized treating physician on January 17, 1998. As plaintiff's symptoms persisted and she was not satisfied with the medical treatment she had received, plaintiff subsequently obtained permission to treat with Dr. Mark Brenner, an orthopedic surgeon.
4. On June 30, 1998, plaintiff visited Dr. Brenner's physician's assistant for complaints of right hand pain with numbness and tingling. Plaintiff's examination findings indicated that she had carpal tunnel syndrome and her right carpal tunnel was injected with medication. At this time, plaintiff was again restricted to light duty work and defendant provided other tasks for her to perform in the clock assembly process.
5. Plaintiff returned to Dr. Brenner on July 21, 1998, reporting that the right carpal tunnel injection and change in work duties had led to improvement in her symptoms. Dr. Brenner indicated at this visit that plaintiff could gradually increase her work activities but that she was restricted from performing the dialing position.
6. Plaintiff reported problems with both hands at her next visit with Dr. Brenner on September 24, 1998. At this time, Dr. Brenner injected plaintiff's left wrist and ordered nerve conduction studies which proved to be consistent with bilateral carpal tunnel syndrome.
7. Dr. Brenner performed right carpal tunnel release surgery on plaintiff's right wrist on October 26, 1998, and left carpal tunnel release surgery on plaintiff's left wrist on November 30, 1998. Plaintiff recovered well following both of these operations and Dr. Brenner subsequently released her to return to light duty work effective December 21, 1998. Dr. Brenner also advised that plaintiff could gradually increase her activities and return to full duty work on an as tolerated basis.
8. Defendant provided plaintiff with light-duty work for a period of time and subsequently returned her to the dialing job despite her objections. Plaintiff's hands began to hurt and swell while performing the dialing position; thus, she returned to Dr. Brenner on April 13, 1999 at which time he wrote a note permanently restricting her from performing the dialing position.
9. Defendant then reassigned plaintiff to her previous successfully held UPC labeling position which involved placing a label on boxes coming down a conveyor belt. Plaintiff was required to place a sticker on approximately one out of four boxes, a total of 1,000 boxes per day or 125 boxes per hour. As many as four persons affixed labels to boxes during any given shift as part of defendant's production process. This production process was incomplete without the appropriate UPC label being affixed to a particular box and failure to properly label all boxes resulted in temporary production line shutdowns until the unlabelled box was found. Defendant was subject to being fined by its customers for labeling failures.
10. Defendant utilized the same standard discipline procedure for disabled and non-disabled employees who failed to adequately perform their assigned job duties. Defendant's discipline procedure included the following official steps all documented in writing: (1) verbal warning, (2) written warning, (3) suspension and (4) termination.
11. Plaintiff failed to label every box which she was supposed to label and was subjected to defendant's usual four step disciplinary process including conferences with her supervisors and written documentation of her misconduct on April 19, April 27, April 28, and May 5, 1999. Plaintiff was terminated on May 5, 1999 for her failure to adequately perform the UPC labeling job duties. Plaintiff provided no explanation to her supervisors during any of these four conferences as to why she was missing labeling any boxes. Fannie Dockery, plaintiff's foreperson, Carol Sessoms, plaintiff's team leader, and Lisa Beasley, defendant's human resource manager all testified that when plaintiff was asked why she was missing UPC labels, her response each time was that "she just missed them" or "I do not know." Plaintiff never reported to her supervisors that she was missing UPC labels due to any problems with her hands or anything else even though she was directly asked by her supervisors what were her ideas as to what was happening and whether there was a problem.
12. Although plaintiff testified at the deputy commissioner hearing that she had some difficulty with her hands while performing the UPC labeling job, she failed to report any such problems to defendant via her supervisors, Dr. Brenner, or any other physician at the time she was allegedly again experiencing the onset of hand symptoms. Previously, when experiencing hand complaints while performing the dialing position, plaintiff promptly notified her supervisors and sought out additional medical treatment with Dr. Brenner; thus, the Full Commission finds that plaintiff was fully aware, capable, and understood the necessity and consequences of reporting her symptoms to both her employer and medical provider.
13. Dr. Brenner testified that he did not recall plaintiff ever complaining about the UPC labeling position during the course of his treatment and that she did not seek treatment with him again after returning to that position in April 1999. On May 10, 1999, Dr. Brenner deemed plaintiff at maximum medical improvement following carpal tunnel surgeries, assigned a four percent (4%) permanent partial disability rating to both of her hands as a result of her compensable occupational disease, and issued plaintiff permanent work restrictions of no repetitive pushing, pulling, gripping, fingering and pinching.
14. Plaintiff was interviewed on February 2, 2000 and participated in vocational testing with self-employed rehabilitation counselor/consultant Stephen D. Carpenter. Mr. Carpenter acknowledged at his deposition that the workers' compensation vocational assessment referrals he had received since 1997 were from attorneys representing claimants (approximately 100 referrals per year) and he had received no referrals from attorneys representing employers/insurance carriers in that time. Mr. Carpenter opined that plaintiff was not employable at all based upon his own vocational testing. Mr. Carpenter's opinion that plaintiff was entirely unemployable was unchanged following his examination of two other functional capacity evaluations of plaintiff that indicated she was capable of performing sedentary or medium level work.
15. Joseph Appollo, PhD, psychologist, administered a WAIS-III cognitive skills test on February 29, 2000 wherein plaintiff's overall IQ score was 59 which placed her in the extremely low range of cognitive ability. While Dr. Appollo had no specific opinion regarding plaintiff's ability to work, he stated that other individuals with similar cognitive deficits are capable of employment.
16. Plaintiff underwent a functional capacity evaluation (FCE) using the Blankenship System method on August 10, 2000 performed by occupational therapist Jane Mantovani. Ms. Mantovani interpreted these FCE results to indicate that plaintiff was capable of performing sedentary level work that did not involve repetitive duties.
17. Plaintiff underwent a functional capacity evaluation using the Ergo Science Method on August 22, 2000 performed by physical therapist Charles Earl (Chuck) Jackson, PT. Mr. Jackson stated that the Ergo Science Method is the only functional capacity evaluation (FCE) method to his knowledge that has had validity and reliability studies published in a peer reviewed journal. FCE tasks involving plaintiff's fine motor skills most closely related to her compensable bilateral carpal tunnel injury produced highly inconsistent results. Although plaintiff performed in the 0-24th percentile on three fine motor tests, she scored in the 90-100th percentile in the hand tool dexterity test and 50-75th percentile for both hands in the isometric grip strength test. Mr. Jackson stated that these FCE results indicated that plaintiff was capable of sustaining a medium level of work for an eight hour workday and that all physical demands of the UPC labeling job matched her physical capabilities. Mr. Jackson also testified at his deposition that nothing in his evaluation of plaintiff's physical abilities indicated that she was unable to perform the UPC labeling position.
18. Dr. Brenner testified that a position wherein plaintiff was required to place approximately 1,000 UPC stickers during an eight hour shift was reasonable for her so long as she did not complain of pain associated with it, stating that placing one sticker every twenty seconds "would not be a particularly difficult job. That would qualify as a sedimentary [sic.] you know, sedimentary [sic.] type of activity with perhaps minimal force used." Dr. Brenner went on to state that if plaintiff was missing UPC labels but was not complaining of pain or discomfort, he did not have a medical explanation as to why she was missing the labels. When specifically taking into account Mr. Carpenter's vocational assessment and physical therapist Chuck Jackson's Ergo Science functional capacity evaluation, Dr. Brenner's opinion did not change regarding the scope of plaintiff's permanent work restrictions or that the UPC labeling position was suitable to plaintiff's physical abilities given her permanent work restrictions.
19. Plaintiff previously successfully performed both the UPC labeling position and more complicated dialing position while employed by defendant despite her cognitive deficits. No evidence has been presented that plaintiff's compensable occupational disease has in any way aggravated or further impaired her preexisting cognitive abilities.
20. Based upon the totality of the evidence including expert medical opinions, medical records, functional capacity evaluation reports, and all witness testimony, the Full Commission finds that the UPC labeling position was suitable employment within plaintiff's permanent work restrictions assigned by Dr. Brenner. The act of pulling and sticking approximately 125 stickers on boxes per hour, or a little more than two per minute, does not equate to a sufficient rate of gripping, fingering, or pinching with one's hands to constitute "repetitive" work that is not in accordance with plaintiff's fine motor abilities as found on her functional capacity evaluations or as described in Dr. Brenner's permanent work restrictions.
21. The greater weight of the competent evidence fails to show that plaintiff's lack of cognitive ability or work-related occupational disease prevented her from performing the UPC labeling job duties upon her release to return to work with restrictions in January 1999 or anytime thereafter following her successful bilateral carpal tunnel surgeries. Plaintiff was mentally and physically able to perform the job duties of the UPC labeling position.
22. Plaintiff did not attempt to see Dr. Brenner or any other medical provider or report to her supervisors that she was experiencing hand pain or discomfort while performing the UPC labeling job between April 13, 1999, when she was again reassigned to the UPC labeling position, and May 5, 1999, the date of her termination. Plaintiff's termination from the UPC labeling position for failure to properly label boxes was solely due to her failure to adequately perform the job duties and was in no way related to her compensable occupational disease.
23. Following plaintiff's termination for failure to place UPC labels on boxes on May 5, 1999, plaintiff was required by the Employment Security Commission (ESC) to search for other employment while she drew unemployment benefits for the next twenty-six weeks; however, no job was offered to her. Plaintiff testified that none of the forty-six employers she visited during her ESC job searches were hiring at the time of her inquiries, and that during November and December 1999 she ceased her job search entirely as she was without the use of a vehicle.
24. Plaintiff also testified that she has not searched for work since January 2000 after being awarded Social Security Disability benefits. Defendant did not provide plaintiff with vocational rehabilitation services prior to the date of the deputy commissioner hearing on the basis that plaintiff was given suitable employment which she constructively refused by failing to adequately perform the work provided by defendant.
25. Plaintiff's only evidence of ongoing disability related to her compensable occupational disease is her own testimony that she experienced ongoing hand symptoms following her reassignment to the UPC labeling position on April 13, 1999 and subsequent termination on May 5, 1999 and thereafter. Although plaintiff testified that she was experiencing ongoing hand symptoms between the date of her termination, May 5, 1999 and date of Dr. Brenner's deposition, October 2, 2000, she did not seek treatment with Dr. Brenner or any other medical provider for her hands during this time period. Plaintiff also produced no evidence that any alleged ongoing symptoms related to her compensable occupational disease and/or permanent work restrictions resulting therefrom have inhibited her from finding suitable employment with any of the forty-six potential employers she visited following her termination from defendant; instead, plaintiff's testimony indicates that these employers simply were not hiring at all. Having weighed all of the evidence of record, the Full Commission finds that plaintiff has failed to rebut defendant's showing that her inability to find work is related to her compensable occupational disease.
26. Defendant has raised an issue regarding the validity of plaintiff's average weekly wage. A Form 21 Agreement for Compensation for Disability was approved in this case on December 22, 1998 which indicates plaintiff's average weekly wage was $250.00 on the date of injury; however, the agreement was subject to verification with respect to the wage. Defendant failed to submit a properly completed Form 22 Statement of Days Worked and Earnings of Injured Employee and only submitted payroll records and incomplete time records in lieu thereof. Without complete time records, plaintiff's average weekly wage cannot be properly computed. The Full Commission, therefore, finds that the greater weight of the evidence does not negate the $250.00 average weekly wage as recorded on the fully executed Form 21.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The UPC labeling position is regularly available in the course of defendant's business and does not constitute a "make work" position for purposes of determining whether or not plaintiff has been offered suitable employment. N.C. Gen. Stat. §97-32, Shah v. Howard Johnson, 140 N.C. App. 58;535 S.E.2d 577, (2000).
2. Based upon plaintiff's age, education, physical limitations, vocational skills, and experience, she is capable of performing the UPC labeling position offered by defendant; therefore, the UPC labeling position constitutes suitable employment. N.C. Gen. Stat. § 97-32, McLean v. Eaton Corp., 125 N.C. App. 391,481 S.E.2d 289, (1997), and Burwell v. Winn-Dixie Raleigh,114 N.C. App. 69, 73, 441 S.E.2d 145, 1459 (1994).
3. Plaintiff's successful return to work with defendant in the UPC labeling position ended the presumption of disability in this case pursuant to the approved Form 21, Agreement for Compensation of Disability. Brown v. S N Communications, Inc.,124 N.C. App. 320, 330-31, 477 S.E.2d 197, 203 (1996).
4. Defendants have successfully demonstrated that plaintiff's termination from this position was solely for misconduct that would also have resulted in termination of a nondisabled employee and her termination was for reasons unrelated to her compensable injury; therefore, plaintiff's termination constitutes constructive refusal of suitable employment. N.C. Gen. Stat. §97-32, Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 234, 472 S.E.2d 397, 401 (1996).
5. Plaintiff has failed to rebut the showing of defendant that her failure to perform post-injury suitable employment or subsequently obtain comparable work with another employer was the direct result of her work-related injury; therefore, plaintiff is entitled to no additional temporary total or temporary partial disability compensation. N.C. Gen. Stat. §§ 97-29 and 97-30.
6. Plaintiff's average weekly wage as agreed upon but subject to modification by the parties on the Form 21 Agreement for Compensation for Disability approved by the Commission was recorded as $250.00 per week yielding a weekly disability compensation rate of $166.67. As defendant has failed to produce sufficient evidence that this calculation is incorrect, defendant is not entitled to modify plaintiff's disability compensation rate. N.C. Gen. Stat. §§ 97-2(5) and 97-82.
7. Plaintiff is entitled to receive $166.67 per week for a period of sixteen weeks based on the assigned permanent partial impairment rating of four percent (4%) to each hand. N.C. Gen. Stat. § 97-31.
8. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident, subject to the limitations of N.C. Gen. Stat. § 97-25.1 so long as such treatment was reasonably necessary to effect a cure or give relief or lessen the period of disability. N.C. Gen. Stat. §97-25.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff in the amount of $166.67 per week for sixteen (16) weeks for permanent partial disability compensation as a result of this compensable occupational disease, subject to the attorney's fee hereinafter approved. These benefits have accrued and shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this compensable occupational disease.
3. An attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded herein is approved for plaintiff's counsel. Defendant shall pay this fee in a lump sum.
4. Defendants shall pay the costs.
This the __ day of July, 2006.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER